**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **PHILLYWINE LLC**, <br><br> *Plaintiff,* <br><br> v. <br><br> **KSWCO, LLC et al.**, <br><br> *Defendants.* | **Case No. 2:26-cv-01268-JDW** |

## <u>MEMORANDUM</u>

In both winemaking and trademark law, subtle distinctions can lead to different outcomes. Geography, use, history, and even marketing can make all the difference. This case arises from a dispute between two Philadelphia businesses that teach people about wine, and now they have a fight about whether one of them has shown protectable rights in the phrase "Philly Wine School." While Philly Wine LLC claims to have senior rights in the mark as compared to the Wine School of Philadelphia ("Wine School"),[1] it has not made a showing to demonstrate that its likely to prevail on that claim. At best, it has shown that it and its predecessor business have used the term sporadically until the last couple of years, while the Wine School has used the term for close to a decade. On the record before me, I therefore conclude that a preliminary injunction is not appropriate.

---

[1] The Defendants in this case are KSWCO LLC, Salkeds LLC, The National Wine School LLC, and Keith Wallace. For the most part, PhillyWine does not distinguish between them, so throughout this opinion, I will refer to them collectively as the "Wine School," unless there is a need to distinguish among them.

## I.    BACKGROUND

### A.    Factual History

#### 1.    PhillyWine

Neal Ewing operated a sole proprietorship in Philadelphia that offered wine courses, tastings, and certification programs. Mr. Ewing's program became an approved provider of Wine & Spirit Education Trust ("WSET") courses in 1999, allowing it to deliver standardized curriculum and administer examinations leading to globally recognized credentials. In 2001, Mr. Ewing registered the domain phillywine.com, and that domain has served as the business's primary website and communication platform since that time. Over the next two decades, Mr. Ewing had a sustained presence in the Philadelphia wine education market. His program offered instruction across multiple levels and attracted students locally and from outside the region. The business did not operate from a fixed location. Instead, Mr. Ewing held classes at a variety of venues, including restaurants, event spaces, and academic institutions.

Mr. Ewing appears to have marketed his services under different names, but the most common was "Neal Ewing Wine Services." As recently as 2022 and 2023, industry materials and publications referred to the program as "Neal Ewing Wine Services." (ECF No. 25-1 at 49-53.) From at least 2008 through 2022, the phillywine.com website likewise identified the business as operating "as Neal Ewing Wine Services" since 1988. (*Id.* at 41, 46.)

In 2022, Mr. Ewing retired. His daughter and son-in-law, Noelle Allen and Dr. Matt Kirkland respectively, established PhillyWine LLC and acquired his business, including the assumption of the business's liabilities and obligations. There is some question about the exact scope of this transaction, though, because PhillyWine has not submitted any assignment agreement, transfer documents, or other contemporaneous records. PhillyWine contends that Mr. Ewing assigned the business's assets, including its goodwill and asserted trademark rights. The new owners continued operating as a WSET-approved provider and expanded the business's programming and institutional relationships.

After the transition, the business underwent a period of operational development, apparently including online offerings that were not immediately available for purchase and classes held at temporary locations such as the Sofitel Hotel in Philadelphia. Over time, PhillyWine expanded and formalized its operations. It entered institutional partnerships with Drexel University's Goodwin College of Professional Studies, where courses began in early 2026, as well as with James Madison University and Northampton Community College. PhillyWine also shifted its physical model. Although it had historically operated across rotating venues, it began offering classes at a fixed location at the Fitler Club in Philadelphia, a short distance from the Wine School Of Philadelphia's facility.

PhillyWine promotes its services through its website, email communications, and social media. For years, it used the Instagram handle @_phillywine_. In 2025, it changed that handle to @phillywineschool and updated certain online biographies to refer to its principals as associated with "PhillyWine School." (ECF No. 25 at 7, 10.) More than 5,600

students have participated in its courses over time, and the business has generated several million dollars in revenue, with substantial investment in advertising and promotion.

### 2. Wine School

KSWCO operates a wine education business in Philadelphia historically known as the Wine School of Philadelphia. The business traces back to 2001, when Mr. Wallace began offering introductory wine classes in the region before developing a more formalized educational program. In its early years, the program held classes at temporary venues, but it quickly evolved into a structured institution offering recurring courses, certification tracks, and public-facing events.

Over time, the Wine School established a consistent physical presence. After operating in several locations, it settled in 2015 at 109 South 22nd Street, where it continues to host classes and programming on a regular basis. Its programming includes wine classes, certification tracks, tastings, and events, and, like PhillyWine, it serves consumers interested in wine education at varying levels of experience. The school has developed a base of repeat students and participants drawn from the local community. The Wine School does not offer WSET courses, but it conducts classes frequently, often multiple times per week. It promotes and offers its programming through its website, vinology.com.

As the business developed, it appeared in the marketplace under both its formal name and shorter variations. Media coverage and third party publications referred to it as "the Wine School" and "Philly Wine School" as early as 2005, and that terminology

continued to appear in articles, reviews, and event descriptions over time. (*Id.* at 8-9; ECF No. 25-1 at 19, 91.) Beginning around 2016, the Wine School used "Philly Wine School" more specifically in connection with consumer-oriented classes, and that terminology appeared in promotional materials and media coverage. Mr. Wallace also used related branding, including the Instagram handle @phillywine, to promote those offerings.

### 3.    The parties' relationship

For many years, the parties operated in the same geographic market without litigation. During that period, they offered overlapping services but maintained distinct identities shaped by differences in format, location, and presentation. PhillyWine's programming was distributed across multiple venues and later expanded online, while the Wine School's operations were anchored to a single, consistent location. Their offerings also appear to have appealed to somewhat different audiences, with PhillyWine emphasizing credentialed instruction and the Wine school offering programming oriented toward general consumers and enthusiasts. In 2019, counsel associated with WSET contacted Mr. Wallace regarding comparisons on his website between his business and PhillyWine. In response, Mr. Wallace revised his website to include disclaimers distinguishing the two.

The parties' relationship took a turn after PhillyWine LLC acquired Mr. Ewing's business. According to the Wine School, it did not know who had taken over Mr. Ewing's program until late 2024, when the business began using "PhillyWine School" in its outward-facing materials. Around that time, PhillyWine updated its branding and online

presence, including references to "PhillyWine School" on its website, marketing materials, and social media accounts. Web archives indicate that earlier versions of PhillyWine's website did not use that terminology.

As these developments unfolded, the parties' proximity increased both geographically and in how they presented their services to consumers. This overlap coincided with instances of apparent consumer confusion. PhillyWine identifies inquiries from prospective students who referenced "Philly Wine School" when seeking information about its courses, as well as online reviews and public comments that do not clearly distinguish between the two businesses. The Wine School attributes that confusion to PhillyWine's use of overlapping terminology and contend that it has affected their own programming, including the cancellation of at least one course offering.

### 4.    The federal trademark application and registration

On November 23, 2024, Mr. Wallace, through his entity KSWCO, applied to register the mark "PHILLY WINE SCHOOL" with the United States Patent and Trademark Office for wine education services. In that application, Mr. Wallace asserted a first-use date of August 15, 2016, and declared that, to his knowledge, no other party had the right to use the mark in a confusingly similar manner. The USPTO initially refused registration on the grounds that the mark was geographically descriptive. In response, Mr. Wallace did not dispute the descriptive nature of the mark. Instead, he sought registration under Section 2(f) of the Lanham Act by asserting that the mark had acquired distinctiveness through use in commerce. To support that position, he submitted additional materials, including

a declaration attesting to substantially exclusive and continuous use of the mark for several years, as well as evidence aimed at showing recognition of the mark in the marketplace.

After reviewing that supplemental submission, the USPTO accepted the claim of acquired distinctiveness and approved the mark for registration. It ultimately issued a registration for "PHILLY WINE SCHOOL" on December 9, 2025. The record also reflects that Mr. Wallace was aware of the existence of PhillyWine before filing the application.

### 5.    Enforcement efforts and escalation of the dispute

After obtaining registration, Mr. Wallace undertook efforts to protect the goodwill associated with the "Philly Wine School" mark and his business. He did so in response to PhillyWine's use of similar terminology in its branding and online presence, which the Wine School contends created confusion in the marketplace and traded on its reputation. Against that backdrop, Mr. Wallace sought to enforce the mark through third party platforms that host or promote PhillyWine's business. He submitted complaints to social media and web-service providers asserting that PhillyWine's use of similar terminology infringed the registered mark. Those efforts included communications with Instagram on or around December 18, 2025, which resulted in the suspension of PhillyWine's @phillywineschool account. PhillyWine had used that account to promote courses, communicate with students, and maintain its online presence.

PhillyWine represents that it lost access to that account, including its accumulated followers and content, and has been unable to restore it. The account had functioned as

a primary means of outreach, particularly for announcing upcoming classes and engaging with prospective students. PhillyWine contends that the account will be permanently disabled if Mr. Wallace does not withdraw his complaint before June 16, 2026. After the suspension, PhillyWine created a new Instagram account under the handle @mywineschool to continue promoting its courses and communicating with students. Mr. Wallace offered to restore the original account if PhillyWine agreed to stop using the @phillywineschool handle, but PhillyWine declined. The parties dispute both the purpose and the effect of these enforcement actions.

On or around December 23, 2025, Mr. Wallace also contacted Google regarding PhillyWine's business listing. He submitted an "ownership request" seeking to transfer control of PhillyWine's Google Business account. That listing appeared in search results and on Google Maps and included information about PhillyWine's courses, location, and contact details. The complaint asserted that the use of "Philly Wine School" in connection with that listing infringed KSWCO's registered mark.

On January 5, 2026, Mr. Wallace submitted a similar complaint to Squarespace, the platform hosting PhillyWine's website at phillywine.com. That complaint likewise asserted trademark infringement based on PhillyWine's use of "Philly Wine School" in connection with its services. Although the site has not been removed, PhillyWine contends that the complaint placed its website at risk of disruption and required a response to avoid potential suspension.

8

### B.    Procedural History

PhillyWine initiated this action on February 26, 2026, following KSWCO's registration of the mark and efforts to enforce it. The Complaint asserts claims under the Lanham Act and related theories, challenging both the validity of KSWCO's registration and its use of the mark in commerce. Shortly after filing suit, PhillyWine moved for a preliminary injunction. Through that motion, it seeks to enjoin the Wine School's use of "Philly Wine School," prohibit further enforcement efforts directed at third party platforms, and require the Wine School to withdraw complaints submitted to entities such as Instagram, Squarespace, and Google. The motion also asks me to prevent the Wine School from interfering with PhillyWine's online accounts and business listings during the pendency of this litigation. The preliminary injunction motion is ripe for disposition. I resolve it on the written submissions without an evidentiary hearing or oral argument.[2]

## II.    LEGAL STANDARD

A district court has discretion to grant or deny a preliminary injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178-79 (3d Cir. 2017). The primary purpose of preliminary injunctive relief is to maintain the status quo until the court can render a decision on the merits. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The status quo refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citations omitted). Because a preliminary injunction

---

[2] During a status call that I conducted, each party stated that it did not seek an evidentiary hearing on the motion.

is an extraordinary remedy, a moving party must make a clear showing that it is entitled to that relief. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20. The first two factors are "the most critical," and the moving party bears the burden of making the requisite showing. *Reilly*, 858 F.3d at 176, 179 (citations omitted). If either or both of the fundamental requirements—likelihood of success on the merits and probability of irreparable harm if relief is not granted—are absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.,* 24 F.3d 519, 523 (3d Cir.1994).

When resolving a motion for a preliminary injunction, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)). This requirement must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage, "procedures ... are less formal and evidence is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718. Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting *Levi Strauss & Co. v.*

*Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). The weight given to such materials will vary depending on the facts and circumstances of the case. *Id.* at 719.

## III.   DISCUSSION

### A.   Likelihood Of Success On The Merits

A party seeking a preliminary injunction must establish a likelihood of success on the merits. *Winter*, 555 U.S. at 20. In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975).

Trademark law protects a mark holder's right to use its mark exclusively when another's use is likely to cause confusion.[3] *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). "A trademark is defined in 15 U.S.C. § 1127 as including 'any word, name, symbol, or device or any combination thereof' used by any person 'to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if

---

[3] PhillyWine's Complaint includes several additional state law claims. In its motion for a preliminary injunction, however, it does not address those claims or explain how they bear on the preliminary injunction analysis. A party seeking preliminary relief bears the burden of showing, among other things, a likelihood of success on the merits of the claims it asserts. *Ferring Pharm,* 765 F.3d at 210. That requires more than simply pleading those claims in a complaint; it requires developing argument and pointing to evidence that would support them at this stage. Accordingly, I do not evaluate those claims independently or consider them as a basis for granting a preliminary injunction.

that source is unknown.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (quoting 15 U.S.C. § 1127). To prevail on a claim for trademark infringement, a plaintiff must establish that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000)). The same standard applies to claims for federal trademark infringement, federal unfair competition, and Pennsylvania common law unfair competition. *A & H Sportswear*, 237 F.3d at 210.

PhillyWine asserts rights in three marks—"PhillyWine," "phillywine.com," and "Philly Wine School." The alleged infringement, however, centers on the Wine School's use of "Philly Wine School," which is the relevant mark for purposes of assessing the merits of PhillyWine's claims. For that mark in particular, PhillyWine cannot establish any of these elements. It therefore has not shown a likelihood of success on the merits.

### 1.    Validity and protectability

A party can prove a mark's validity and legal protectability whether the mark is federally registered or not. *See United States PTO v. Booking.com B.V.*, 591 U.S. 549, 553 (2020). Common law protects an unregistered mark only to the extent that the mark is inherently distinctive or has acquired distinctiveness through secondary meaning. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986). Courts assess distinctiveness by placing marks into categories, from strongest to weakest. *MNI Mgmt., Inc. v. Wine King,*

*LLC*, 542 F. Supp.2d 389 (D.N.J. 2008). Arbitrary and fanciful marks bear no logical relationship to the goods or services and are inherently distinctive. *A & H Sportswear, Inc.*, 237 F.3d at 221. Suggestive marks, which require some imagination to connect the mark to the product, are also inherently distinctive. *Id.* at 221-22. At the other end are descriptive marks, which "convey[] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 221. Descriptive marks are not protectable unless they have acquired secondary meaning. *See Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 769 (1992). A mark has secondary meaning when consumers understand it not only to identify a product or service, but also to identify its source. *See Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438. "Proof of secondary meaning entails vigorous evidentiary requirements, and the burden of proof rests upon the party asserting rights in the purported mark." *Patient Transfer Sys., Inc. v. Patient Handling Sols., Inc.*, No. CIV. A. 97-CV-1568, 1999 WL 54568, at *6 (E.D. Pa. Jan. 29, 1999) (quoting *Ideal World Marketing, Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 245 (E.D.N.Y. 1998)).

### a.    Type of mark

PhillyWine cannot establish that "Philly Wine School" is inherently distinctive. The phrase describes, in straightforward terms, the service that it offers. "Philly" denotes Philadelphia. "Wine" identifies the subject matter. "School" describes the nature of the service that PhillyWine offers. Put together, the phrase conveys an immediate idea of a

wine school located in Philadelphia. It does not require imagination, thought, or perception to understand what the business does. It says it directly.

That is the hallmark of a descriptive mark. *See A & H Sportswear*, 237 F.3d at 221. Courts routinely find marks descriptive where they combine a geographic term with the service offered. *See Trans Pac. Ins. Co. v. Trans-Pac. Ins. Co.*, 739 F. Supp. 240, 244 (E.D. Pa. 1990); *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1362 (Fed. Cir. 2018). This mark fits comfortably in that category. PhillyWine does not argue otherwise. Its arguments instead focus on use and confusion, which bear on secondary meaning rather than inherent distinctiveness. Because "Philly Wine School" is descriptive, PhillyWine must establish that the mark has acquired secondary meaning.

### b.    Secondary meaning

To show secondary meaning, PhillyWine must demonstrate that "the consuming public primarily associates the mark with a particular source." *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438. Secondary meaning is generally established through extensive advertising which creates in the minds of consumers an association between different products bearing the same mark; this association suggests that the products originate from a single source. *Scott Paper Co.*, 589 F.2d at 1228. To determine secondary meaning, a court may consider the following (non-exclusive) list of factors: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of

customers; and, (11) actual confusion." *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438 (citation omitted). No single factor is dispositive. The question remains whether the mark identifies a single source in the minds of consumers. *Lapp,* 721 F.2d at 462.

PhillyWine's evidence does not establish that association. First, much of the evidence establishes that PhillyWine and its predecessor did not continuously use the name "PhillyWine" in commerce, let alone the name "Philly Wine School." Instead, for much of its existence, it marketed itself under the banner "Neil Ewing Wine Services." The primary use of a phrase related to "PhillyWine" was its domain name "phillywine.com," but that alone is not enough to establish use, and PhillyWine doesn't argue otherwise.

Second, to the extent PhillyWine offers evidence about its use of the term "PhillyWine," that evidence centers on its broader business identity and its use of different designations such as "PhillyWine" and "phillywine.com." That evidence could demonstrate recognition of those terms, though in my view it doesn't reach that level. But in any event, it does not demonstrate that consumers associate the distinct phrase "Philly Wine School" with PhillyWine. Evidence that consumers recognize one name does not, without more, establish that they associate a different phrase with the same provider, and the record does not provide that additional showing. *See id.* at 438.

To the contrary, nothing in the record suggests that PhillyWine's consumers encountered "Philly Wine School" associated that phrase with PhillyWine's services before 2025 or that anyone came to understand the phrase as identifying PhillyWine's business. Its customer declarations underscore the point—they consistently reference familiarity

with "PhillyWine," not the mark at issue. That pattern confirms that any goodwill in the marketplace attaches to a different designation.

The remainder of PhillyWine's evidence does not change that result. Its proof of sales, growth, and market presence reflects the success of its business, but it does not tie that success to the "Philly Wine School" mark. Nor does its evidence of actual confusion carry meaningful weight. The few instances it identifies arise only after more recent use of the phrase, including in 2025, and therefore do not demonstrate longstanding marketplace recognition.

Exclusivity presents a further obstacle. The phrase "Philly Wine School," like "Philly wine," is descriptive of a category of services, and similar terminology appears in use by third parties across the wine community to refer to businesses, programs, and individuals. (See ECF No. 25 at 19–20.) That type of widespread descriptive use undermines any inference that consumers would associate the phrase with a single provider. PhillyWine offers no evidence to the contrary.

My conclusion that "Philly Wine School" does not have secondary meaning might appear in tension with the fact that the Wine School obtained a federal registration for one of the same marks that PhillyWine asserts based on a showing of acquired distinctiveness before the USPTO. But PhillyWine asserts its own rights in the mark and must make its own showing. That inquiry turns on the evidence PhillyWine has produced. Having reviewed that evidence, it is not sufficient to establish that the phrase has acquired secondary meaning as PhillyWine has used it. This conclusion does not call into question

the USPTO's determination; it reflects only that PhillyWine has not met its burden to establish that the marks it asserts are valid and legally protectable.

PhillyWine also argues that the term "school" is descriptive, and its showing that "PhillyWine" is distinctive renders the term "Philly Wine School" a logical descriptive extension of its distinctive mark. But because I have concluded that "PhillyWine" is not distinctive, that argument fails.

### 2.    Ownership of the "Philly Wine School" trademark

Even if KSWCO's federal registration remains presumptively valid, PhillyWine can still prevail by showing that it "had prior rights or 'priority' in the mark" such that it can establish ownership of the mark.[4] *Lucent*, 186 F.3d at 315 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir. 1978). Trademark rights arise from use, not registration, and a senior user may defeat a later registrant by showing priority.[5] *Beasley v. Howard*, 14 F.4th 226, 237 (3d Cir. 2021). Under the Lanham Act, "use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not made

---

[4] The Parties spend substantial time debating whether KSWCO's federal registration of "Philly Wine School" is valid, but that dispute doesn't seem to matter. Even if KSWCO's registration is valid, PhillyWine might still have senior rights. However, because I conclude that PhillyWine doesn't have senior rights, I don't have to determine, for purposes of a preliminary injunction, whether PhillyWine is likely to prevail in its challenge to KSWCO's federal registration. To the extent that PhillyWine argues that it should obtain a preliminary injunction just because it might prevail in its challenge to KSWCO's registration, I reject that argument because PhillyWine has not made a showing that KSWCO's common law trademark rights are invalid.

[5] This intuition extends beyond the law. Apropos of this case, Neil Diamond wrote "Red Red Wine" in 1967, but UB40's cover in 1983 made the song globally famous. Most listeners know the UB40 version, but Neil Diamond still owns the song.

merely to reserve a right in a mark." 15 U.S.C.§ 1127. Thus, to prevail, PhillyWine must show that it used the mark in commerce before KWSCO and that its use was sufficiently public to identify its services in the minds of consumers. That inquiry turns on both priority of use and market penetration. *Lucent*, 186 F.3d at 315-17.

Courts assess market penetration by considering (1) volume of sales of the trademarked product; (2) the growth trends, both positive and negative, in the area; (3) the number of people purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area. *See Natural Footwear, Ltd., v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398-99 (3d Cir. 1985). The use must be more than *de minimis*, but it need not reflect overwhelming success. Even modest commercial activity may suffice if it reflects genuine use of the mark followed by continued efforts to develop the market. *See Lucent*, 186 F.3d at 317-18.

### a.    Prior use and market penetration of "Philly Wine School"

PhillyWine's evidence does not establish prior use or market penetration.[6] PhillyWine points to website materials from the early 2000s that reference its programming, but those references are descriptive and embedded in broader text. They do not show that PhillyWine presented "Philly Wine School" to the public as the name of its services. Nor would those isolated references have created meaningful recognition of

---

[6] For purposes of this analysis, I assume that Neal Ewing transferred the asserted trademark rights to PhillyWine LLC. If this case moves forward, PhillyWine will have to provide proof of that transaction.

the phrase in the marketplace. Trademark rights arise when a term is used consistently and prominently so that consumers associate it with a source. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). The materials PhillyWine identifies do not reflect that kind of use.

The broader record reinforces that conclusion. For much of the relevant period, the business promoted itself as "Neal Ewing Wine Services." That was its outward-facing identity. A phrase cannot develop market significance if it is not the name under which the business holds itself out to consumers. If "Philly Wine School" had served that role, the record would reflect consistent and visible use of that phrase across advertising, course offerings, and public-facing materials. It does not. Instead, the record shows more direct use of the phrase only in recent years, including changes to social media in 2025. That timing undermines any claim of longstanding recognition.

PhillyWine's evidence of business growth points me in the same direction. PhillyWine emphasizes decades of operation, increasing enrollment, and millions of dollars in revenue. But it presents those metrics at the enterprise level. They do not show that any of that commercial activity occurred under the "Philly Wine School" name. PhillyWine does not isolate sales made using that mark, provide any breakdown of revenue tied to it, or show that customers purchased services because they encountered that phrase in the market. Growth can reinforce market recognition, but only if it reflects increasing use of the mark at issue. In this case, the record does not connect the business's

19

growth to "Philly Wine School," nor does it suggest that any increase in revenue corresponded with greater public recognition of that phrase.

The same disconnect appears in PhillyWine's evidence concerning its customers and advertising. It points to the breadth of its student base, its national reach, and its role as a WSET provider. But it does not show that those customers understood "Philly Wine School" to refer to its services. The declarations confirm as much—students and industry participants refer to "PhillyWine," not "Philly Wine School," when describing their experiences. That is telling. It indicates that whatever goodwill exists in the marketplace attaches to the "PhillyWine" name rather than the phrase now at issue. Nor does PhillyWine show that its advertising promoted "Philly Wine School" as its brand or exposed consumers to that phrase in a way that would create recognition. Promotion of one name does not establish recognition of another.

PhillyWine's own admissions underscore these points. It acknowledges that it "did not regularly use 'Philly Wine School.'" (ECF No. 30 at 5.) That concession is difficult to reconcile with its claim of longstanding market recognition. Recognition in the marketplace develops through repeated and consistent exposure to a name. Sporadic or recent use cannot produce that result. At most, the record reflects isolated references followed by more recent, deliberate use of the phrase. That is not enough to establish prior use and market recognition. Thus, PhillinWine has not established ownership of the mark.

### b.      Family of marks theory

PhillyWine also suggests a different path to priority. It contends that because it used "phillywine.com" and "PhillyWine" before the Wine School, and because "Philly Wine School" is simply a related formulation that adds a generic term, those uses establish priority in "Philly Wine School" that predates the Wine School's use of the mark. In effect, it invokes a family of marks theory.

"A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991). Trademark law recognizes a family of marks theory in limited circumstances where there is a "recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." *See J & J Snack Foods Corp.*, 932 F.2d at 1462; *A & H Sportswear, Inc.*, 237 F.3d at 222. In other words, "[s]imply using a series of similar marks does not of itself establish the existence of a family." *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426 (D.N.J. 2008) (citations omitted).

PhillyWine has not established the elements required to invoke that doctrine. It does not show that it used a consistent series of marks sharing a common characteristic in a way that would create a recognizable pattern in the marketplace. Nor does it show that consumers perceive any shared element—such as "PhillyWine" or "Philly Wine"—as

identifying a single source across multiple marks. The evidence instead indicates that

recognition attaches to "PhillyWine" and "phillywine.com" as individual designations, not

to a broader family of marks. PhillyWine also does not show that consumers view "Philly

Wine School" as part of a unified branding scheme or associate that phrase with the same

source based on any common element. Without evidence of both a pattern of use and

consumer recognition of a shared characteristic, the family of marks theory does not

apply. PhillyWine's prior use of "PhillyWine" therefore does not establish priority in the

distinct mark "Philly Wine School."

### 3. Likelihood of Confusion

To prevail on its infringement claims, PhillyWine must also show that the Wine

School's use of "Philly Wine School" is likely to cause confusion. *See A&H Sportswear*, 237

F.3d at 210-11. Likelihood of confusion exists "when the consumers viewing the mark

would probably assume that the product or service it represents is associated with the

source of a different product or service identified by a similar mark." *Dranoff–Perlstein*

*Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992).

As the Third Circuit recognized in *Lapp*, although secondary meaning and

likelihood of confusion are formally distinct concepts, the two inquiries may be difficult

to separate in practice because the evidence supporting each often overlaps. 721 F.2d at

462, 465. Courts in this Circuit evaluate likelihood of confusion by applying the ten *Lapp*

factors, which include: "(1) the degree of similarity between the owner's mark and the

alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods

and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." *Lapp*, 721 F.2d at 463. No single factor controls the analysis, and the factors do not carry equal weight in every case. The inquiry is qualitative, not quantitative, and courts must evaluate the factors in light of the particular facts presented. *See id.* at 463; *A & H Sportswear, Inc.*, 237 F.3d at 214-15.

### a.    Degree of similarity

Marks "are confusingly similar if ordinary consumers would likely conclude that [two products] share a common source, affiliation, connection or sponsorship." *Fisons*, 30 F.3d at 477. Courts should not conduct a "side-by-side comparison," but instead should analyze "whether the labels create the same overall impression when viewed separately" by examining sight, sound, and meaning of the marks. *Sabinsa Corp. v. Creative*

*Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010). The Third Circuit has recognized that similarity may be the most important of the *Lapp* factors. *Fisons*, 30 F.3d at 476.

PhillyWine asserts rights in "PhillyWine," "Phillywine.com," and "Philly Wine School," while the Wine School uses "Philly Wine School." To the extent PhillyWine relies on that same phrase, the marks are identical in wording, which weighs in favor of similarity. But the phrase itself is composed of ordinary terms that describe the location and subject matter of the services. That feature limits how much weight identity alone carries and requires closer attention to how the phrase functions in the marketplace.

The comparison between "PhillyWine," "Phillywine.com," and "Philly Wine School" points in a different direction. The marks share the terms "Philly" and "Wine," which are the most recognizable components of each and would likely draw a consumer's attention. At the same time, the marks differ in structure, sound, and meaning. "PhillyWine" appears as a single, continuous term that functions as a brand name. "Philly Wine School," by contrast, appears as a multi-word phrase that describes a type of business. The inclusion of the word "School" signals a particular category of services and gives the phrase a descriptive character that differs from the more compact presentation of "PhillyWine."

The shared terms create some overlap in impression, while the structural and descriptive differences distinguish the marks in how consumers encounter them. Considering the marks as a whole, this factor does not favor either party.

### b. Strength of the mark

The second *Lapp* factor considers the strength of the asserted mark. Stronger marks are more likely to cause confusion. *See Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203 (3d Cir. 1995). The strength of a mark is determined by "the distinctiveness or conceptual strength of the mark" and "the commercial strength or marketplace recognition of the mark." *Id.* at 221. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" *Id.*

Considering the asserted marks collectively, this factor does not favor PhillyWine. As to conceptual strength, "Philly Wine School" is descriptive. The phrase conveys the location and subject matter of the services and does not require imagination or inference. Marks of that kind are comparatively weak. The same is largely true of "phillywine.com," which combines a geographic term with the subject matter of the services and adds only a domain suffix. Although "PhillyWine," presented as a single term, is somewhat more distinctive, it still incorporates common terms that appear in the marketplace in connection with wine-related services. The presence of similar terminology in use by others bears on how distinctive these marks are in context and weighs against a finding of strong conceptual distinctiveness.

The marks are also weak in terms of commercial strength. That inquiry turns on whether consumers recognize the marks as identifying a particular provider. *See A & H Sportswear*, 237 F.3d at 224. PhillyWine relies on evidence of its overall success, including

its years of operation, revenue, customer base, and marketing efforts. That evidence shows that PhillyWine operates a successful business, but it does not establish that consumers associate the asserted marks—particularly "Philly Wine School"—with PhillyWine. As I've explained, the record reflects that at most, some recognition in the marketplace attaches to "PhillyWine," not to "Philly Wine School," and PhillyWine has not shown that the marks function together as a cohesive branding scheme. Because the asserted marks are conceptually weak and lack demonstrated marketplace recognition as used by PhillyWine, this factor weighs against a finding of likely confusion.

### c. Time without actual confusion and evidence of actual confusion

*Lapp* factors (4) and (6) look at evidence of actual confusion. "[W]hile evidence of actual confusion would strengthen plaintiff's case, it is not essential." *Fisons*, 30 F.3d at 476. At the same time, the absence of confusion during a period of concurrent use permits an inference that consumers are unlikely to be confused. *See Kos Pharms.*, 369 F.3d at 717-20.

PhillyWine identifies only a small number of alleged instances of confusion, including a December 2025 email from a student who initially believed a program that KSWCO operated was affiliated with PhillyWine. Even crediting that example, the evidence remains limited. It consists of isolated, anecdotal confusion and does not show a pattern of sustained or widespread misunderstanding in the marketplace. The circumstances of that example further reduce its probative value. The inquiry reflects, at most, an initial

assumption, and nothing in the record shows that the individual enrolled in the wrong program, paid the wrong provider, or remained confused.

The timing of the alleged confusion also limits its significance. The examples arise in late 2025, when PhillyWine began using "Philly Wine School" more directly in its outward-facing branding. That timing makes it difficult to attribute any confusion solely to the Wine School's use of the phrase and weakens any inference that the phrase previously identified PhillyWine in the marketplace.

More importantly, the record contains no evidence of confusion during earlier periods of coexistence. PhillyWine operated for years under the "PhillyWine" name, while the Wine School used "Philly Wine School," or similar phrasing, in the marketplace. Yet PhillyWine does not identify any instances of confusion from that earlier period or point to contemporaneous complaints or inquiries. On this record, the evidence of actual confusion remains minimal, and the absence of confusion over a period of concurrent use further diminishes its significance. This factor does not favor PhillyWine.

### d.    Intent

The fifth *Lapp* factor examines the Wine School's intent. A defendant's "intentional, willful and admitted adoption of a mark closely similar to the existing marks" may provide strong evidence of a likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 286 (3d Cir. 2001). Courts also consider the adequacy and care with which a defendant investigates and evaluates a proposed mark, as well as its

knowledge of similar marks or allegations of potential confusion. *See Kos Pharms.*, 369 F.3d at 721.

The record reflects that the Wine School was aware of PhillyWine's business. Both parties operated in the same geographic market and offered wine education services in Philadelphia, which supports an inference of awareness. But the relevant question is whether KSWCO adopted or used "Philly Wine School" to capitalize on the goodwill and reputation associated with that mark. *Homevestors of Am., Inc. v. Warner Bros. Discovery*, No. CV 22-1583-RGA, 2025 WL 2301911, at *8 (D. Del. Aug. 8, 2025). The record does not support that inference. Evidence in the record shows that third parties have referred to KSWCO's business as "Philly Wine School," or similar variations, in media coverage and third party publications dating back to the mid-2000s, while PhillyWine operated under the "PhillyWine" name and domain. Despite that overlap, PhillyWine identifies no evidence of conflict, confusion, or enforcement efforts during those years, which undercuts the claim that KSWCO adopted the phrase to trade on an established mark belonging to PhillyWine.

PhillyWine instead points to KSWCO's more recent conduct of filing various third party complaints following federal registration. But KSWCO's decision to enforce its registered mark through established channels does not, by itself, demonstrate bad faith. The timing of those actions corresponds with KSWCO's own more recent use of "Philly Wine School" in its outward-facing branding, including changes to its social media presence in 2024 and 2025. Additionally, Mr. Wallace offered to restore PhillyWine's

Instagram account if it agreed to stop using the @phillywineschool handle, which reflects an effort to assert and resolve competing claims rather than to create confusion. On this record, the evidence shows a dispute over competing uses of a descriptive phrase, not an attempt to mislead consumers or trade on another's reputation. This factor does not favor PhillyWine.

### e.    Marketing channels, advertising media, and target customers

The seventh *Lapp* factor examines whether the parties market their services through the same channels of trade and advertise through similar media. *See A & H Sportswear*, 237 F.3d at 215. Courts consider the media the parties use to promote their services, including the ways in which they reach consumers through advertising and sales efforts. *See Checkpoint*, 269 F.3d at 288-89; *Kos Pharms.*, 369 F.3d at 722. The eighth *Lapp* factor considers whether the parties seek to attract the same class of consumers. *See Checkpoint*, 269 F.3d at 288-89. Where the parties target overlapping audiences, the likelihood of confusion increases because consumers are more likely to encounter the marks in similar purchasing contexts. *Id.*

In thise case, the parties' marketing channels and target customers overlap in various ways. Both offer wine education services in the Philadelphia area and operate in the same geographic market, with locations in close physical proximity to one another. That proximity increases the likelihood that consumers will encounter both parties when searching for or considering wine education services. Each promotes its offerings through

similar means, including websites, social media platforms such as Instagram, online listings, and email outreach. Both also appear in search results and on third party platforms that aggregate local businesses and educational offerings. Consumers seeking wine education are therefore likely to encounter both parties through the same general channels, particularly through online searches and social media, where the marks may appear in proximity to one another.

At the same time, the parties present their offerings differently. PhillyWine emphasizes structured certification programming, including WSET courses, while KSWCO focuses more on consumer-oriented classes and events and have maintained a more consistent physical location. These differences reflect variations in emphasis, not distinct markets. Consumers interested in wine education may reasonably consider both types of offerings depending on their level of interest or experience.

Taken together, the overlap in marketing channels, geographic market, and target customers outweighs the differences in presentation. These factors weigh slightly in PhillyWine's favor, although the differences in emphasis and branding limit the strength of that conclusion.

### f.    Price and the relation of goods in the minds of consumers

These *Lapp* factors consider the conditions under which consumers encounter the parties' services, whether those services are sufficiently related that consumers would

expect a common source, and whether other circumstances suggest likely association. *See Checkpoint*, 269 F.3d at 284, 286, 290; *Kos Pharms.*, 369 F.3d at 722-23.

Consumers of wine education services exercise varying levels of care. Certification programs require a financial and time commitment, which encourages comparison of providers based on curriculum, scheduling, and level of instruction. That context reduces the likelihood of confusion. At the same time, both parties offer more casual, lower-cost classes that consumers may select with less deliberation. These considerations offset one another and do not point decisively in either direction.

The parties' services overlap to a degree, as both offer wine education in the same geographic market. Consumers could view certain offerings as substitutes. That overlap, however, largely mirrors considerations addressed elsewhere, including the similarity of services and shared audience, and does not independently alter the analysis here. These factors do not favor either party and are neutral.

### g.       Weighing the factors

Considering the *Lapp* factors as a whole, PhillyWine has not shown a likelihood of confusion. The factors that carry the greatest weight point away from confusion. The asserted mark is descriptive and lacks demonstrated marketplace recognition, which limits the scope of protection afforded to it. The evidence of actual confusion is minimal, recent, and tied to PhillyWine's own more recent use of the phrase, and the parties operated for years without any identified instances of confusion. That history undermines any inference that consumers associate "Philly Wine School" with PhillyWine. The evidence also does

not support a finding that the Wine School adopted or used the phrase to trade on PhillyWine's goodwill. These considerations collectively weigh against a finding that consumers are likely to be confused.

The remaining factors do not alter that conclusion. Although the marks share the terms "Philly" and "Wine," that overlap reflects descriptive language used by multiple providers, and the marks differ in structure and meaning when considered as a whole. The parties use similar marketing channels, target similar consumers, and operate in close geographic proximity, which increases the likelihood that consumers will encounter both offerings. Even so, those considerations carry less weight here given the nature of the phrase at issue and the absence of suggestive evidence of confusion. The conditions under which consumers purchase these services cut in different directions and do not favor either side, and the relationship between the parties' offerings largely overlaps with considerations already addressed. In this context, the overlap in channels, audience, and location does not outweigh the factors pointing away from confusion. The balance of the *Lapp* factors therefore does not support a finding that the Wine School's use of "Philly Wine School" is likely to cause confusion, and PhillyWine has not established a likelihood of success on the merits of its infringement claim.

### B.    Irreparable Harm

To obtain a preliminary injunction, a party must make a clear showing of "immediate irreparable injury" or a "presently existing actual threat." *Acierno*, 40 F.3d at 655. Irreparable harm refers to injury that cannot be repaired, retrieved, or adequately

compensated after a final judgment, and the plaintiff must show that an injunction is necessary to prevent that harm. *Id.* at 652-53. A speculative risk or the mere possibility of future injury does not suffice. *Id.* at 655. Nor does economic loss, standing alone, qualify as irreparable harm because monetary damages can address that type of injury. *Id.* at 652.

A "party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted." *Ferring Pharm., Inc. v. Watson Pharm., Inc.,* 765 F.3d 205, 217 (3d Cir. 2014). In the trademark context, courts recognize that certain types of harm, such as loss of control over reputation, damage to goodwill, and the risk of consumer confusion, may be difficult to quantify and therefore can constitute irreparable injury. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 195-96 (3d Cir. 1990); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998). Even so, a plaintiff is not entitled to rely on those principles in the abstract. It must show that irreparable harm is likely in the absence of an injunction. *See Ferring Pharms., Inc.,* 765 F.3d at 217.

PhillyWine has shown a likelihood of irreparable harm. The harm it identifies does not rest solely on alleged consumer confusion. Instead, it arises from the disruption of its ability to control how it presents itself to customers and to communicate with them through the channels on which its business depends. Most notably, the suspension of its @phillywineschool Instagram account resulted in the loss of an established platform through which it advertised courses, communicated with students, and maintained

ongoing relationships with its customer base. That loss includes not only past content but also access to followers and prospective students accumulated over time. Those are not losses that can be readily quantified or restored through damages after trial. They go directly to PhillyWine's ability to maintain its presence in the market and to control how its brand is perceived.

The same is true, though to a lesser extent, of the challenges directed at PhillyWine's website and online business listings. Even if those efforts did not result in permanent removal, they introduced instability into the digital infrastructure on which the business relies. Modern service-based businesses depend on consistent online visibility, and the ability to control one's website and public-facing listings is central to maintaining customer relationships and reputation. Interference with those channels, particularly where they occur in connection with assertions of trademark infringement, carries a risk of reputational harm that is difficult to measure after the fact. It can affect how consumers encounter the business, whether they are able to locate it, and whether they perceive it as legitimate or subject to dispute.

The Wine School responds that some of the alleged harm did not materialize and that any remaining harm is either speculative or self-inflicted. But the record reflects that at least one significant disruption has already occurred, and that others were sufficiently concrete to require response. That is enough at this stage. Irreparable harm does not require complete business shutdown or permanent loss of all channels of communication. It requires a showing of a significant risk of harm that cannot be adequately remedied

later. The loss of a primary social media account and the threatened disruption of core online business tools satisfy that standard.

### C.      Balance of Equities

In determining whether a preliminary injunction should issue, a judge must balance the potential hardships that either side will endure as a result of the injunction. *Opticians Ass'n of Am.,* 920 F.2d at 197. The balance favors KSWCO. The relief PhillyWine seeks would require KSWCO to stop using "Philly Wine School" and to unwind enforcement efforts taken in reliance on a federal trademark registration that remains valid and has not been invalidated. The USPTO's issuance of that registration carries legal consequences, including a presumption of validity and an exclusive right to use the mark in commerce for the listed services. 15 U.S.C. § 1115(a); *Lucent,* 186 F.3d at 315. Enjoining KSWCO from using its registered mark at this stage would therefore deprive it of rights the law recognizes while the merits remain unresolved. It would also disrupt how KSWCO identifies and markets its business, which has operated under that name for years.

PhillyWine, by contrast, continues to operate its business through its website and alternative channels, even if its preferred social media presence has been disrupted. The harms it identifies are not insignificant, but they do not match the scope of the relief it seeks or the burden that relief would impose on the Wine School. Weighing those competing interests, the equities do not favor issuing an injunction.

### D.    Public Interest

The public interest concern in trademark infringement cases is "the interest in the prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.*, 369 F.3d at 730. This factor requires me to consider the consuming public's interest in not being deceived or confused by the use of an infringing mark. *Opticians Ass'n*, 920 F.2d at 197. Because PhillyWine has not shown a likelihood of confusion or established protectable rights in "Philly Wine School," issuing a preliminary injunction would not serve the public interest.

## IV.    CONCLUSION

PhillyWine has not carried its burden to show that it is entitled to preliminary injunctive relief. It has not demonstrated a likelihood of success on the merits of its claims, which is a threshold requirement, and the balance of the remaining factors does not alter that conclusion. Although PhillyWine has shown a risk of irreparable harm, that showing cannot overcome its failure to satisfy the gateway requirement. I will therefore deny PhillyWine's motion for a preliminary injunction. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

May 26, 2026

36